JULIE FRONABARGER,     )
           )
  Plaintiff,      )
           )
 vs.         )    **Case No. 4:10CV 2189 LMB**
           )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,  )
           )
  Defendant.     )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Julie Fronabarger for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 16). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17). Plaintiff has filed a Reply. (Doc. No. 17).

## Procedural History

On January 30, 2008, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on February 1, 2006. (Tr. 93-95, 96-103). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 26, 2009. (Tr. 41-42, 45-

58, 8-22).  On October 5, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-6).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on September 16, 2009.  (Tr. 23).  Plaintiff was present and was represented by counsel.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she was thirty years of age, and lived with her boyfriend.  (Tr. 24).  Plaintiff stated that she was four-feet ten-inches tall and weighed 105 pounds.  (Tr. 24-25).  Plaintiff indicated that she had lost weight because she was going through a divorce at the time of the hearing.  (Tr. 25).

Plaintiff testified that she had a three-year-old son, who lived with her.  (Id.).

Plaintiff stated that she attended college for two to three years but did not obtain a degree.  (Id.).  Plaintiff testified that she studied business and that she had last attended school in 2002.  (Tr. 26).

Plaintiff stated that she worked for American Home Lending as a processor and a mortgage broker.  (Id.).  Plaintiff testified that she put together the documents necessary for a home loan at this position.  (Id.).

Plaintiff stated that she alleged a disability onset date of February 1, 2006 because she was diagnosed with Clinically Isolated Syndrome ("CIS")[1] at that time.  (Tr. 27).  Plaintiff testified

---

[1]Term used to describe one episode of a neurological symptom such as optic neuritis, caused by inflammation or demyelination of nerve tissue.  Many of these patients go on to develop multiple sclerosis over time.  See http://www.webmd.com/multiple-sclerosis (last visited February

that CIS occurs prior to multiple sclerosis ("MS").[2]  (Id.).

Plaintiff stated that she sees Dr. Barbara Green, a neurologist, for her CIS.  (Id.).  Plaintiff testified that Dr. Green suspects that she may have MS but she has to undergo another brain scan before she can be diagnosed with MS.  (Tr. 28).  Plaintiff stated that she has not undergone the brain scan due to insurance problems.  (Id.).

Plaintiff testified that her first symptoms occurred about ten years prior to the hearing. (Id.).  Plaintiff stated that she started experiencing dizziness, and problems with her balance. (Id.).  Plaintiff testified that she was not working at that time because she was extremely tired, unable to concentrate, and had memory difficulties.  (Id.).

Plaintiff stated that she participated in training for Client Services, a debt collection agency, from August 1, 2007 through August 8, 2007.  (Tr. 29).  Plaintiff testified that she started this position because she thought she would try to work and see what she was capable of doing. (Id.).  Plaintiff stated that she was unable to complete training because she did not pass the tests. (Tr. 30).  Plaintiff testified that she was unable to remember the information required to pass the tests.  (Id.).  Plaintiff stated that she has not tried to work anywhere else since that time.  (Id.).

Plaintiff testified that she lost the vision in her right eye some time after she stopped working for Client Services.  (Id.).  Plaintiff stated that she was completely blind in her right eye for four to six months and then slowly regained her vision.  (Tr. 31).  Plaintiff testified that she

_____

10, 2012).

[2]Common demyelinating disorder of the central nervous system, causing patches of sclerosis (plaques) in the brain and spinal cord; occurs primarily in young adults.  Typical symptoms include visual loss, weakness, paresthesias, bladder abnormalities, and mood alterations.  Stedman's Medical Dictionary, 515 (28th Ed. 2006).

still has problems with depth perception and blurriness. (Id.). Plaintiff stated that she has not driven in a couple of years because she was involved in an automobile accident due to her poor vision. (Id.).

Plaintiff testified that she was having the same problem at the time of the hearing that she has had her whole life: she was extremely tired. (Tr. 32). Plaintiff stated that she also had a lot of muscle weakness, primarily in her upper legs but also in her arms and other areas. (Id.). Plaintiff testified that she has problems with balance, and that she notices herself bearing off to one side when she is walking. (Id.). Plaintiff stated that she occasionally becomes light-headed when going from a sitting position to standing. (Id.).

Plaintiff testified that she experiences pain from the bottom of her right foot to her knee when she is active. (Id.). Plaintiff stated that this occurs when she is standing washing dishes. (Id.). Plaintiff testified that she is able to stand for about ten minutes before she has to sit. (Tr. 33).

Plaintiff stated that she has a three-year-old son at home and that taking care of him has gotten easier as he gets older. (Id.). Plaintiff testified that her parents help her a lot with her son. (Id.). Plaintiff stated that her parents come to her home almost daily to help with meals, laundry, and cleaning, and to take them places. (Id.). Plaintiff testified that she needs help from her parents because she lacks the energy and focus to finish tasks. (Id.).

Plaintiff stated that she started seeing a psychiatrist for anxiety and depression at the request of her neurologist, Dr. Green. (Id.). Plaintiff testified that she did not believe she was depressed but she does experience nervousness. (Tr. 34).

Plaintiff stated that she experiences jerking in her arms and legs when she is at rest. (Id.).

Plaintiff testified that this occurs approximately every ten to fifteen minutes, especially when she is lying down. (Id.). Plaintiff stated that even her hips and mouth jerk occasionally. (Id.).

Plaintiff testified that she has difficulty sleeping at night and that she takes an over-the-counter sleep aide. (Tr. 35). Plaintiff stated that she usually takes a thirty to forty-five minute nap in the afternoon. (Id.).

Plaintiff testified that she spends her days trying to complete as many household tasks on her list as possible. (Id.). Plaintiff stated that she is happy if she completes two out of ten items on her list. (Id.). Plaintiff testified that she is unable to complete tasks because she has no energy. (Id.).

Plaintiff stated that she usually performs tasks such as cleaning in ten-to-fifteen-minute intervals, because she will feel worse if she works longer. (Id.). Plaintiff testified that she sweeps, mops, vacuums, and washes dishes in short intervals. (Tr. 35-36). Plaintiff stated that she sits down to rest with her son after a ten-to-fifteen-minute interval. (Tr. 36). Plaintiff testified that she is able to do laundry but does not fold clothes right away because it is too difficult. (Id.). Plaintiff stated that when she shops for groceries, she tries to get in and out of the store. (Id.). Plaintiff testified that her parents or her boyfriend's children often shop with her and carry the groceries. (Tr. 37). Plaintiff stated that she occasionally performs yard work when the weather is temperate. (Id.). Plaintiff testified that she mows the lawn for ten to fifteen minutes, and then goes inside to take a break. (Id.).

Plaintiff stated that she does not belong to a church or any other clubs or organizations. (Id.).

Plaintiff testified that Dr. Green wants her to start physical therapy and to resume

Betaseron[3] injections.  (Id.).  Plaintiff stated that she planned on starting the injections soon after the hearing.  (Tr. 38).  Plaintiff testified that Dr. Green placed her on a list of uninsured people waiting to undergo MRIs and CT scans.  (Id.).  Plaintiff stated that Dr. Green would like her to undergo an MRI because she was experiencing mild exacerbations with increased numbness.  (Id.).  Plaintiff testified that Dr. Green was looking for a diagnosis of MS.  (Id.).

The ALJ then examined plaintiff, who testified that she had been living with her boyfriend for about six months.  (Id.).  Plaintiff stated that her boyfriend had joint custody with his ex-wife of his children, who were ages twelve, eleven, nine, and six.  (Id.).  Plaintiff testified that her boyfriend's children lived with her every Monday and Tuesday, and on alternate weekends.  (Id.).  Plaintiff stated that she cooked meals for her boyfriend's children when they were at her home.  (Tr. 39).  Plaintiff testified that the children took the bus to school.  (Id.).

## B.    **Relevant Medical Records**

The record reveals that plaintiff saw Richard E. Parcinski, D.O. from October 2003 through March 2008, for various complaints, including anxiety and GERD.[4]  (Tr. 195-216).  In October 2003, plaintiff complained of anxiety but was doing well on Xanax.[5]  (Tr. 216).  Plaintiff was prescribed antidepressants in 2004, which "work[ed] out good."  (Tr. 209).  On May 15, 2006, plaintiff called

---

[3]Betaseron is indicated for the treatment of relapsing forms of multiple sclerosis to reduce the frequency of clinical exacerbations.  See Physician's Desk Reference (PDR), 757 (63rd Ed. 2009).

[4]A syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus.  See Stedman's at 556.

[5]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety.  See PDR at 2764.

Dr. Parcinski stating that she had just gotten married, had a baby, and wanted refills of Xanax and GERD medication. (Tr. 207). Dr. Parcinski prescribed one month of medication and scheduled an appointment for May 17, 2006. (Id.). Plaintiff did not show up for her appointment. (Tr. 206). Plaintiff called the office on June 2, 2006, requesting more Xanax. (Id.). Dr. Parcinski prescribed just enough medication for the weekend. (Id.). Plaintiff presented for refills on June 7, 2006, and July 10, 2006, at which time she reported that she was "doing okay." (Tr. 204-05). On October 23, 2006, Dr. Parcinski prescribed Lexapro[6] and Klonopin.[7] (Tr. 203).

Plaintiff presented to opthalmologist Bruce Frank, M.D., on September 6, 2007, with complaints of blurry vision. (Tr. 220). Dr. Frank diagnosed plaintiff with papillitis[8] and probable demyelination.[9] (Id.). Dr. Frank had a lengthy discussion with plaintiff about the possibility of MS and referred plaintiff to Dr. Barbara Green, M.D. at the West County Multiple Sclerosis Center. (Id.).

Plaintiff underwent an MRI of the brain on October 12, 2007, which revealed a white matter lesion with peripheral enhancement in the right frontal lobe most likely representing an area of acute demyelination. (Tr. 188). A second white matter lesion was also noted. (Id.). Follow-up imaging was recommended. (Id.).

In a letter addressed "To whom this may concern" dated December 10, 2007, Dr. Green

---

[6]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 1175.

[7]Klonopin is indicated for the treatment of panic disorder. See PDR at 2639.

[8]Optic neuritis with swelling of the optic disk. Stedman's at 1414-15.

[9]Loss of myelin with preservation of the axons or fiber tracts. Central demyelination occurs within the central nervous system (e.g., the demyelination seen with multiple sclerosis); peripheral demyelination affects the peripheral nervous system. See Stedman's at 509.

stated that plaintiff was under her care for the treatment of optic neuritis.[10]  (Tr. 189).  Dr. Green stated that, due to optic neuritis, plaintiff was currently unable to work or operate a motor vehicle. (Id.).

In a treatment note date December 19, 2007, Martha Fenger, a social worker in Dr. Green's office, indicated that she had discussed financial and insurance issues with plaintiff.  (Tr. 191). Plaintiff reported that she was applying for disability benefits.  (Id.).  Ms. Fenger encouraged plaintiff to apply for Medicaid and food stamps.  (Id.).

In another letter addressed "To Whom It May Concern" dated January 8, 2008, Dr. Green stated that plaintiff had experienced "an event classified as clinically isolated syndrome, but does not yet meet the specific criteria for the diagnosis of multiple sclerosis."  (Tr. 194).  Dr. Green indicated that plaintiff was experiencing difficulties with distorted vision, stiffness in her arms and legs, disequilibrium, fatigue, and memory problems.  (Id.).  Dr. Green noted that, due to these difficulties, plaintiff was not working.  (Id.).  Dr. Green indicated that she would determine at a later date when plaintiff may return to work.  (Id.).

Plaintiff saw Dr. Green on January 29, 2008, for a follow-up regarding her clinically isolated syndrome ("CIS").  (Tr. 255).  Plaintiff reported that she was doing "reasonably well" on Betaseron. (Id.).  Plaintiff reported no new episodes of visual loss, although she complained of fatigue, stress, and difficulty concentrating.  (Id.).  Plaintiff indicated that she was sleeping ten to twelve hours a night but her sleep was disrupted.  (Id.).  Plaintiff remained on Lexapro for her mood and continued to have some depressive symptoms.  (Id.).  Upon examination, plaintiff had normal muscle mass and tone and strength.  (Id.).  Dr. Green's impression was that plaintiff was suffering from some

---

[10]Inflammation of the optic nerve.  Stedman's at 1308.

generalized fatigue, which may be related to a motor vehicle accident that occurred two months prior, her prior optic neuritis, or the Betaseron. (Id.). Dr. Green indicated that there was no evidence for definite new disease relapse. (Id.). Dr. Green encouraged plaintiff to sleep adequately and to exercise. (Id.).

Dr. Parcinski completed a medical source statement on March 3, 2008, in which he expressed the opinion that plaintiff had no work-related physical or mental limitations. (Tr. 197). Dr. Parcinski indicated that plaintiff had been diagnosed with anxiety and GERD, and had been prescribed Protonix[11] and Klonopin. (Tr. 198).

Dr. Frank completed a medical source statement on March 5, 2008, in which he indicated that plaintiff's visual acuity, with best correction, was 20/20 in her left eye and 20/300 in her right eye.[12] (Tr. 217). Dr. Frank noted that plaintiff had been diagnosed with papillitis. (Id.). Dr. Frank indicated that plaintiff was seen in September 2007 and was supposed to follow-up in one month, but failed to return. (Id.).

Plaintiff saw Riaz A. Naseer, M.D. for a consultative neurology examination on April 12, 2008. (Tr. 224-26). Upon examination, plaintiff's visual acuity was 20/25 bilaterally. (Tr. 225). Plaintiff's mental status was normal. (Id.). Dr. Naseer's impression was: history of optic neuritis affecting the right eye in November 2007; and ongoing complaints of generalized fatigue, decreasing strength, and difficulties maintaining balance. (Id.). Dr. Naseer noted that plaintiff had some

---

[11]Protonix is indicated for the treatment of GERD. See PDR at 3255.

[12]The Snellen visual acuity test employs black symbols in testing the acuity of distant vision; the letters vary in size in such a way that each one subtends a visual angle of five feet at a particular distance. The range of normal vision includes 20/12.5 to 20/25. See Stedman's at 1966.

difficulties in performing tandem and Romberg's,[13] otherwise no focal neurological deficits. (Id.).

Dr. Naseer noted that plaintiff had an ongoing history of diagnosis of anxiety. (Id.). Dr. Naseer found that plaintiff's reflexes were symmetrical, there was no obvious weakness of the muscles on one side or the other side, and plaintiff was able to ambulate independently without an assistive device. (Id.).

Plaintiff saw Sherman Sklar, M.E., Licensed Psychologist, for a psychological evaluation on April 12, 2008. (Tr. 231-34). Mr. Sklar noted that plaintiff did not have any signs of depression-she slept well, her appetitive was good, she laughed often, and did not worry. (Tr. 231). Plaintiff reported feeling sluggish and having difficulty with concentration and memory, which interfered with her ability to work. (Tr. 232). Upon mental status examination, plaintiff was very outgoing, articulate, and upbeat. (Id.). Mr. Sklar found no signs of a thought disorder. (Tr. 233). Plaintiff reported paying her own bills, cooking, doing housework, going grocery shopping, caring for her two-year-old child, reading, going out to eat, gardening, and watching movies. (Id.). Plaintiff had no significant difficulties in social functioning. (Id.). Plaintiff reported that her mind recently "started to wander," and she felt this was getting worse and made it difficult for her to read and to work. (Id.). Dr. Sklar indicated that plaintiff had no psychiatric diagnoses. (Tr. 234).

Judith McGee, Ph.D., a non-examining state agency psychologist, completed a Psychiatric Review Technique on May 1, 2008. (Tr. 243-53). Dr. McGee expressed the opinion that plaintiff had no medically determinable impairment. (Tr. 243).

---

[13]When a patient, standing with feet approximated, becomes unsteady or much more unsteady with eyes closed. Open, it is a sign of proprioception loss. Stedman's at 1771.

Plaintiff saw Dr. Green on May 9, 2008, at which time she reported doing better over recent months, with no new bouts of numbness, weakness, gait difficulty, or visual loss. (Tr. 256). Dr. Green noted that plaintiff's episodes of tingling in her arms and muscle spasms had entirely resolved. (Id.). Plaintiff indicated that she had not needed pain medication, and that her energy level was better. (Id.). Plaintiff also took Klonopin at night for sleep when she was anxious. (Id.). Plaintiff reported being compliant with the Betaseron. (Id.).

On May 30, 2008, plaintiff reported to Ms. Fenger that she had felt much worse the past two to three months, and that she was more fatigued than before. (Tr. 258).

Plaintiff saw Dr. Green on January 28, 2009, at which time she reported no new visual difficulty in recent months, although she was unable to afford to follow-up with the ophthalmologist due to lack of insurance. (Tr. 260). Plaintiff had not had any definite new attack that would suggest clinically definite MS. (Id.). Plaintiff complained of some fatigue, but it was usually in the late afternoon and was ameliorated by napping. (Id.). Plaintiff reported a four-month-long episode of pain in her right foot that went up to her knee, for which she took pain medications that were given to her by her father. (Id.). Dr. Green noted that plaintiff dropped off the trial for Betaseron, her prophylactic medication, as she did not make follow-up visits or comply with study protocol. (Id.). Dr. Green recommended that plaintiff apply to another clinic to receive medical care and pharmaceutical benefits. (Id.). Dr. Green's impression was that plaintiff had not had a second event to confirm a diagnosis of MS. (Id.). Dr. Green diagnosed plaintiff with CIS with risk for conversion. (Id.). Dr. Green indicated that she would like plaintiff to undergo repeat MRI scanning of the brain

to rule out new lesions.  (Id.).  Dr. Green prescribed Provigil[14] for fatigue, at plaintiff's request.  (Id.).

Plaintiff saw psychiatrist Rolando Larice, M.D., on June 17, 2009, at Dr. Green's suggestion. (Tr. 262-64).  Plaintiff complained of anxiety.  (Tr. 262).  Dr. Larice diagnosed plaintiff with generalized anxiety disorder,[15] ADHD,[16] and opioid dependence, with a GAF[17] score of 80.[18]  (Tr. 264).  Dr. Larice found "no evidence of mental disability."  (Id.).  Dr. Larice stated that if plaintiff applies for disability benefits, she "needs to use the neurology because mentally, she's NORMAL." (Id.).

Plaintiff saw Dr. Larice on July 2, 2009, at which time Dr. Larice recommended that plaintiff "get a job."  (Tr. 265).

---

[14]Provigil is indicated to improve wakefulness in adult patients with excessive sleepiness. See PDR at 979.

[15]Chronic, repeated episodes of anxiety reactions; a psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. Stedman's at 569.

[16]A disorder of childhood and adolescence manifested at home, in school and in social situations by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.  Stedman's at 568.

[17]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[18]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  DSM-IV at 32.

Plaintiff saw Dr. Green on August 5, 2009, at which time plaintiff reported difficulties with leg pains and some jerking movements in her legs, which increased when she stood or walked. (Tr. 261). Plaintiff was taking pain medication given to her from a family member. (Id.). Plaintiff thought she had MS, but Dr. Green performed a complete neurologic examination, which was normal. (Id.). Dr. Green's impression was that there was no definite objective evidence that plaintiff had converted to clinically definite MS. (Id.). Dr. Green indicated that, given plaintiff's history of optic neuritis, it would be best for her to be on prophylactic therapy which she was unable to afford. (Id.). Dr. Green offered to prescribed non-narcotic medication for plaintiff's pain, but plaintiff declined. (Id.).

## C.    Medical Records Submitted to the Appeals Council

Plaintiff underwent an MRI of the brain on October 22, 2009, which revealed no new lesions and no convincing evidence of signal abnormality in the optic nerves. (Tr. 271).

On March 4, 2010, plaintiff called Dr. Green's office complaining of excessive fatigue and wanting to change medication. (Tr. 272). On March 30, 2010, plaintiff called indicating that her father had given her a "muscle relaxer" that really helped and did not make her sleepy. (Tr. 273). Plaintiff requested that Dr. Green prescribed this medication. (Id.). Dr. Green was "extremely reluctant" to prescribe a muscle relaxant. (Id.). On April 1, 2010, plaintiff again called Dr. Green's office to request that she prescribe the "muscle relaxant" she had been taking. (Tr. 274). Plaintiff became upset when Dr. Green would not prescribe what Dr. Green referred to as a "strong narcotic." (Id.).

# The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through September 30, 2009.

2. The claimant has not engaged in substantial gainful activity since February 1, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: clinically isolated syndrome (20 CFR 404.1520(c) and 416.920(c)). She has a history of bilateral optic neuritis, anxiety, and gastroesophageal reflux disease.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work.

6. The claimant is capable of performing past relevant work as a mortgage broker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 13-19).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on January 22, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on January 22, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

## A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir.

1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to

perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss

resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.     Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff also contends that the ALJ erred in finding that plaintiff was capable of performing past relevant work. The undersigned will discuss plaintiff's claims in turn.

## 1.     Residual Functional Capacity

Plaintiff argues that the residual functional capacity ("RFC") determined by the ALJ is not supported by medical evidence.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out,

in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work.

(Tr. 16).

Plaintiff contends that the ALJ failed to point to "some" medical evidence to support his determination. Plaintiff argues that due to her fatigue, disequilibrium, difficulty with vision, and difficulty concentrating she is unable to perform the full range of sedentary work.

The undersigned finds that the ALJ's determination is supported by substantial evidence. The ALJ found at step two of the sequential evaluation that plaintiff did not have a severe vision impairment or mental impairment. (Tr. 14-15). Step two of the sequential evaluation process

requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. While the burden is not great, the claimant bears the burden at step two to demonstrate a severe impairment that significantly limits the ability to perform basic work activities. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

With regard to plaintiff's vision, the ALJ noted that plaintiff had a history of bilateral optic neuritis. (Tr. 14). The ALJ cited the findings of Dr. Frank in September of 2007 that plaintiff had a diagnosis of papillitis of the right eye, and that plaintiff's best corrected visual acuity was 20/300 in the right eye and 20/20 in the left eye. (Tr. 14, 220). The ALJ noted that Dr. Green subsequently diagnosed plaintiff with optic neuritis, and indicated in a December 2007 letter that plaintiff could not work or operate a motor vehicle as a result. (Tr. 14, 189). The ALJ pointed out that Dr. Green indicated in a January 2008 letter that plaintiff had experienced an event classified as CIS and that plaintiff was experiencing difficulties with distorted vision. (Tr. 14, 194). In May 2008, plaintiff reported that she was doing better, with no new bouts of visual loss. (Tr. 256). In January 2009, plaintiff reported no new visual difficulty, although she was unable to afford to follow-up with the ophthalmologist. (Tr. 260). Finally, during an April 2008 consultative neurology examination, Dr. Naseer found that plaintiff's visual acuity was 20/25 bilaterally. (Tr. 225).

The ALJ's finding that plaintiff's vision impairment was not severe and did not result in any work-related limitations is supported by substantial evidence. Notably, in plaintiff's most recent eye examination, Dr. Naseer found that her visual acuity was 20/25 bilaterally. (Tr. 225). In addition,

plaintiff reported no new visual difficulty to Dr. Green and never followed-up with the ophthalmologist.

With regard to plaintiff's mental impairments, the ALJ noted that plaintiff had a history of anxiety, for which her primary care physician, Dr. Parcinski, prescribed Xanax. (Tr. 14). The ALJ found that plaintiff's anxiety did not cause more than minimal limitations in plaintiff's ability to perform basic mental work activities and was, therefore, not severe. (Tr. 15). The ALJ discussed the four broad functional areas known as the "paragraph B" criteria. (Id.). The ALJ found that plaintiff had no limitation in her activities of daily living. (Id.). In support of this finding, the ALJ pointed out that plaintiff took care of her boyfriend's four children when they were at her home, cooked, did housework, did yard work, grocery shopped, paid her own bills, gardened, and watched movies. (Id.). The ALJ found that plaintiff had no limitation in social functioning, noting that she lived with her boyfriend and intermittently his four children, saw her parents frequently, liked going out to eat, and had friends. (Id.). The ALJ stated that plaintiff had mild limitations in concentration, persistence, or pace. (Id.). The ALJ noted that plaintiff reported that her mind wandered, causing difficulty in reading and working, although Dr. Larice fund no difficulties in this area. (Id.).

The ALJ also discussed the medical opinion evidence. The ALJ pointed out that Dr. Parcinski expressed the opinion in March 2008 that plaintiff had no work-related physical or mental limitations. (Tr. 197, 18). The ALJ next noted that in April 2008, consultative psychologist Sherman Sklar found that plaintiff had no psychiatric diagnoses. (Tr. 234, 18). The ALJ pointed out that psychiatrist Dr. Larice saw plaintiff in June 2009, and diagnosed plaintiff with generalized anxiety disorder, ADHD, and opioid dependence, with a GAF score of 80. (Tr. 264, 18). Dr. Larice found "no evidence of mental disability." (Id.). Dr. Larice emphasized that if plaintiff were applying for disability benefits,

she should see a neurologist, because mentally she was "NORMAL." (Id.). Plaintiff saw Dr. Larice on July 2, 2009, at which time Dr. Larice recommended that plaintiff get a job. (Tr. 265). The undersigned finds that substantial evidence supports the ALJ's determination that plaintiff's mental impairments resulted in no work-related limitations.

With regard to plaintiff's fatigue and disequilibrium, the ALJ noted that plaintiff was diagnosed with CIS but was never given a definitive diagnosis of MS. (Tr. 17). The ALJ pointed out that abnormalities were noted on an October 2007 MRI of the brain, but plaintiff never underwent a subsequent imaging study. (Tr. 188, 17). In fact, the records plaintiff submitted to the Appeals Council reveal that plaintiff underwent an MRI of the brain in October 2009, which revealed no new lesions and no convincing evidence of signal abnormality in the optic nerves. (Tr. 271).

The ALJ summarized Dr. Green's treatment notes. The ALJ stated that any episodes of weakness, pain, or other related complaints were characterized as intermittent and brief, and resolved. (Tr. 17). The ALJ noted that plaintiff's examinations were generally unremarkable. (Id.). The ALJ pointed out that plaintiff did fairly well on prophylactic injections, with minimal side effects, although she stopped them in 2009 because she failed to make follow-up visits or comply with the study protocol. (Id.). In May of 2008, Dr. Green found that plaintiff was doing better, with no new bouts of numbness, weakness, gait difficulty, or visual loss. (Tr. 256, 17). Plaintiff indicated that she had not needed pain medication, and that her energy level was better. (Id.). In January of 2009, plaintiff complained of some fatigue, but it was usually in the late afternoon and was ameliorated by napping. (Tr. 260). Dr. Green noted that her office had given plaintiff an application to submit to receive medical care and pharmaceuticals at a clinic, but plaintiff had not submitted the application. (Id.). In August 2009, Dr. Green performed a complete neurologic examination, which was normal. (Tr.

261).

The ALJ pointed out that plaintiff saw Dr. Naseer for a consultative neurology examination on April 12, 2008, at which time Dr. Naseer noted some difficulties performing tandem and Romberg's, but found no focal neurological deficits. (Tr. 18, 225). Dr. Naseer found that plaintiff's reflexes were symmetrical, there was no obvious weakness of the muscles on one side or the other side, and plaintiff was able to ambulate independently without an assistive device. (Id.). As previously noted, plaintiff's visual acuity was 20/25. (Id.). Dr. Naseer noted plaintiff's complaints of generalized fatigue, decreasing strength, and difficulties maintaining balance, but found no neurological deficits. (Id.). Finally, the ALJ pointed out that plaintiff's treating physician Dr. Parcinski expressed the opinion that plaintiff had no limitations in any work-related functions, physical or mental. (Tr. 18, 197). The ALJ concluded that plaintiff had some intermittent neurological abnormalities, but nothing that would prevent her from working. (Tr. 18). The objective medical evidence discussed above supports this finding.

In determining plaintiff's residual functional capacity, the ALJ also performed a proper credibility analysis. The ALJ pointed out that plaintiff stopped receiving prophylactic injections because she did not comply with the study protocol, and failed to make follow-up visits. (Tr. 17). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). Plaintiff claimed that she was unable to receive affordable treatment due to lack of insurance. Although an inability to pay may justify a claimant's failure to seek medical care, a claimant must present evidence that her failure to seek treatment was due to the expense. See, e.g. Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (ALJ appropriately discounted claimant's argument he could not

afford medical care absent evidence he sought and was denied low-cost or free care); <u>Johnson v.</u> <u>Bowen</u>, 866 F.2d 274, 275 (8th Cir. 1989) (although lack of funds may sometimes justify failure to seek medical care, there was no evidence plaintiff had told his physicians he could not afford the prescription at issue and was denied the medication). Dr. Green's treatment notes indicate that, after plaintiff was disenrolled from a study, Dr. Green recommended that plaintiff apply to a clinic to receive medical treatment and pharmacy benefits, but plaintiff never completed the application. (Tr. 260). As such, the ALJ properly discredited plaintiff's subjective complaints on this basis.

The ALJ also discussed plaintiff's daily activities. (Tr. 17). The ALJ noted that plaintiff took care of her own three-year-old child, cooked for her boyfriend's four children when they stayed with her, did laundry, washed dishes, did yard work, shopped for groceries, gardened, watched movies, and socialized with friends. (Tr. 17, 233). Significant daily activities may be inconsistent with claims of disabling pain. <u>See</u> <u>Haley v. Massanari</u>, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

Finally, the ALJ pointed out that the objective medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey</u> <u>v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003). As previously discussed, the ALJ properly found that the medical evidence does not support plaintiff's allegations of a disabling impairment.

In sum, the RFC formulated by the ALJ is supported by substantial evidence. The ALJ properly considered evidence from plaintiff's treating MS specialist , treating primary care physician,

and treating psychiatrist, along with opinions from a consulting neurologist and consulting psychologist, all of which support the ALJ's finding that plaintiff is capable of performing the full range of sedentary work. Significantly, plaintiff's treating primary care provider, Dr. Parcinski, found that plaintiff had *no* physical or mental work-related limitations. (Tr. 197-98). In addition, Dr. Larice, plaintiff's psychiatrist, expressed the opinion that plaintiff was mentally normal, and should get a job. (Tr. 265-66). The ALJ also properly found that plaintiff's subjective complaints were not entirely credible. As such, the ALJ's RFC determination is consistent with the record as a whole, including the objective medical evidence.

## 2. Plaintiff's Past Relevant Work

Plaintiff also argues that the ALJ erred in finding that plaintiff was capable of performing past relevant work. Specifically, plaintiff contends that the ALJ failed to consider plaintiff's past work on a function-by-function basis.

An ALJ has a duty to "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work." Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir. 1995) (quoting Nimick v. Secretary of Health and Human Serv., 887 F.2d 864, 866 (8th Cir. 1989)). An ALJ may properly describe the demands of a plaintiff's past relevant work by reference to plaintiff's own description of the actual duties of his or her past relevant work. See Wingert v. Bowen, 894 F.2d 296, 298-299 (8th Cir. 1990) (ALJ properly considered testimony of claimant in determining demands of past relevant job); O'Keefe v. Barnhart, 2002 WL 31452407 at *7 (E.D. Mo. Sept. 3, 2002) ("Based on [plaintiff's] description of her past relevant work, [her] past relevant work as a police officer did not require the performance of work-

related activities precluded by her residual functional capacity. Therefore, [she] can perform her past relevant work as a police officer as she performed it") (bracketed material in original).

In this case, plaintiff described the requirements of her job as a mortgage broker in a work activity report. (Tr. 133-34). Plaintiff indicated that the job required lifting ten pounds occasionally and less then ten pounds frequently, sitting six hours, and standing and walking one hour in an eight-hour workday. (Tr. 133). Plaintiff's description of her past work is consistent with the requirements of sedentary work. See 20 C.F.R. § 404.1567(a) and 416.967(a).

Plaintiff also argues that the ALJ erred in failing to make findings regarding the mental demands of plaintiff's past work and in failing to include mental limitations in plaintiff's RFC. The ALJ, however, found that plaintiff had no mental limitations, and had the RFC to perform the full range of sedentary work. (Tr. 16). As previously discussed, this determination is supported by substantial evidence. The ALJ concluded that, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed." (Tr. 19). The ALJ's determination that plaintiff was capable of performing her past relevant work is supported by substantial evidence.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record supports the ALJ's finding that plaintiff was capable of performing her past relevant work. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  21st  day of February, 2012.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE